Good afternoon, Your Honors. I'm Richard Ellis, representing the Petitioner-Appellant Mr. Sterling Atkins, Jr., and may it please the Court, with the Court's permission, I would like to reserve five minutes of my time for rebuttal. This is a capital habeas action challenging Mr. Atkins' conviction in 1995 and sentence of death for the murder of Ebony Mason, and we are asking this Court to reverse the District Court's denial of Mr. Atkins' habeas petition and grant relief. Okay, Counsel, let me just mention, if you want to make five minutes of rebuttal, please try to stop your initial argument before all your time is used up. Thank you, Your Honor, I will do that. So we're in ADPA land, correct? Excuse me, Your Honor? This is ADPA-controlled, correct? Yes. The District Court granted five COAs on five issues or partial issues. What we have here is nothing less than an extreme malfunction of the state criminal justice system that the Great Writ is intended to correct. The facts underlying the trial performance of defense counsel are both straightforward and indeed shocking. Atkins was represented at trial by two attorneys, one of whom was practically fresh out of law school and had never previously tried a case, and lead counsel, Ms. Malia, accepted the appointment only six days prior to trial, and two of those days were devoted to another case. Although Ms. Malia had some involvement in the case much earlier, it was only as junior counsel at the brief preliminary hearing ten months prior to trial. This is not a case where a counsel was picking up a fully prepared case and not only to present it. As a former attorney, Mr. Sgro was working exclusively on another capital case when he was replaced in Mr. Atkins' case. This unpreparedness is evidenced by the belated evaluation of the mental health expert, Dr. Colissimo, the absence of any defense to the charges, the extremely truncated and misleading mitigation case composed of only four witnesses, two experts who testified unfavorably to Atkins, and only 14 pages of mitigation testimony on direct from two family members. On the opening day of the trial, she had not yet read the jury questionnaires, was left with only a half hour to review them before lunch, over lunch, and the defense had not yet obtained her client's medical records. By any reasonable standard, Mr. Atkins had virtually no defense, either at guilt or punishment. The deficient performance of Ms. Malia continued on to the appeal, which she handled, and where she failed to raise a claim about the jury instruction. I'd like to discuss the jury instruction issue first, if I may. Okay. That's your second certified issue, correct? Yes, that's correct, Your Honor. Okay. So, yeah, why don't you move to that? And I think in state court, Mr. Atkins raised a claim of ineffective assistance of counsel for failure to raise prosecutorial misconduct in the cross-examination of Mr. Hardin. Is that sufficient to exhaust the claim in federal court alleging instructional error? That's what I'm having a problem with there. And I think then, how did Sechrest, which I guess was decided in 2008, really change the legal basis of Mr. Atkins' complaint claim? Yes, Your Honor. So I think there's a strong argument that you didn't ever really exhaust it. Well, Your Honor, it was exhausted. Basically, what happened, it was... Well, how did you exhaust that claim? Because that's what I... Am I wrong in reading the record saying you were dealing with the prosecutorial misconduct in cross-examination of Mr. Hardin? I didn't see that you raised what you're raising here. Yes, the district court held that this claim was originally brought as IAC for failure to raise the claim on appeal, but the Nevada Supreme Court addressed that, and also they addressed the underlying claim on the merits. So therefore, we're arguing it is exhausted. The district court held that the substantive claim, the faulty jury instruction was defaulted, but the IAC of appellate counsel was denied on the merits there. Malia was the appellate counsel. She failed to raise it. She could not be expected to raise it on appeal against herself. So what we have here is the failure, basically, to... Well, getting back to the claim itself... Sorry, I just want to clarify. You are conceding that the underlying substantive claim based on the jury instructions was defaulting? No, we're not. We're arguing that it was decided... When the Nevada Supreme Court decided this issue, they decided that there was no ineffective assistance on appeal because the underlying instruction was correct, and we're saying... You're saying that's effectively a ruling on the merits. Yes, that was a ruling on the merits, and that was incorrect. It ignored clearly established federal law under Caldwell, Simmons, Gardner, etc. So we have case law saying that raising the ineffective counsel claim does not exhaust the underlying substantive claim. Do you have a case that says if the state court rules on the ineffective assistance of counsel claim based on their evaluation of the merits, that that is enough? Yes. Well, we do think it's enough. There are some cases... What's your best case for that? I think that... Well, there is a Supreme Court case under... There's a Supreme Court case that says when the court reaches the merits, that that exhausts the claim. But I guess I understand, is that in the context of the particular scenario that we're talking about? Because I'm trying to reconcile our precedent that says pretty clearly exhausting the ineffective assistance of counsel claim does not exhaust the underlying substantive claim. Well, it doesn't, but I think when they've already reached the merits, it does. Right. So do you have a case that says that so long, even when the only claim that was raised was ineffective assistance of counsel? I don't have it offhand, but I could submit a 28-J letter to the court with that case. Well, let's sort of go back to what happened. The instruction was given, and counsel didn't object to that, correct? Yes. And the jury didn't have any questions about that. And so my understanding of that... And the instruction basically says that there are instances where it can be modified, and there was no objection to that. And then I think the warden testified and said that being in prison is a bad thing. He considers LWOP a bad thing, as far as that goes. And counsel didn't object to anything about that, and didn't object to any statements that... And you haven't even, at this point, objected to any statements that the prosecutor made, basically. It's sort of like... I think everyone... Well, I guess the prosecutor said the only way to stop him was to kill him, basically. Yes. That's the only way that you know that he's not going to kill again. Although the warden testified that... I think Dr. Colosimo also said that your client was less stressed when he was in a custodial situation, and was pretty manageable, as far as that goes. So basically what the jury... It's pretty obvious if you execute someone and if you kill them, they're not going to kill someone else. I don't think anyone can really argue with that proposition. I don't know if there's anyone alive that really thinks that people can't actually get out of custody under any circumstances, because you grow up reading the news, and cases are reversed, and there's any number of things. And the jury didn't... I just don't see that there was any confusion about anything here, and I think that's why counsel didn't object, and then you didn't really raise that, and now you want to say you've exhausted that. Well, Your Honor, yes. The problem here is that the instruction was wrong. It said that he could be paroled in 10 years, and it was really 20 years, so it was incorrect on that basis. And it also urged... It invited the jury to speculate on parole, and what we have here, the prosecution argued parole over and over again. He argued parole six times repeatedly that he tied the argument for a death sentence to Sterling's having committed the murder while on parole. And this is at 2 ER 444, 450, 453, 458, 473, 479. The prosecutor also argued that he was released on parole for only two and a half months before the murder. He also stressed that he did poorly on parole. Okay, let's say we let you get past the exhaustion. Let's say hypothetically that we say you've exhausted it and we confront it. What have you put before us now to tell us, to show us how your client wins at this point? What does your client have to do at that point? Well, what we have to do, Your Honor, is show that the instruction was constitutionally impermissibly suggestive under Caldwell versus Mississippi and Simmons. This is the clearly established federal law under 2254 D1 that the state court didn't examine. So what we have here is this repeated emphasis on parole, which misled the jury to believe that Mr. Adkins could be out on parole in 10 years. He was 21 years old at the time of the trial. The jury thought he could be released at age 31. That's prejudicial. And in reality, he could not have been released for at least 20 years. And he was ineligible because of the conditions of the prior 245. Yes, yes. Nevada revised statute 213.1095.4 holds that someone sentenced to life with parole cannot be released for 20 years and has a history of various things. He would not have been ineligible under those things because he was on parole when this was committed. So what we have here is I think the state is trying to argue that we're hiding, that this is all about pardons. And they do that because the correct statute relating to parole, 1099.4, in effect at the time of Adkins' trial, flatly precluded parole if certain conditions apply. So the jury was misled. Basically, we have that. And the state's argument that this is self-executing, it's not. We're saying here that basically under Caldwell and Simmons that this was prejudicially misleading here. Well it seems though like, okay, so clearly in the trial court the jury instruction wasn't challenged but there was prosecutorial misconduct in cross-examination. And then Adkins argues in front of the Nevada Supreme Court that the issue is addressed when it addressed the related IAC of appellate counsel claim. But what about Rose v. Paul Mateer? That seems that that doesn't help your case. I'm sorry, Your Honor, Rose versus? It's a 2005 case. And the legal arguments available to challenge the jury instruction were available to Adkins at the time that the state court post-conviction proceedings were going on. And he doesn't argue cause based on a case decided after his post-conviction petition. So I'm struggling with, I'm just struggling how we get to where you want us to get here. Well, I think we get there by looking at, it's Caldwell error. It's plain and simple Caldwell error and Simmons error. Caldwell was cited in the state habeas brief. It was not addressed by the Nevada Supreme Court. The prejudice here is that basically this was, this misled the jury basically. We have a jury that's being told time and time again that Mr. Adkins is dangerous. He should not be released on parole. And the only alternative sentence is death. And we, what we have here is that this was not possible. It was not possible for him to be released on parole. I just want to clarify because it seems that you're relying primarily on the challenge to the jury instruction now. Was there a, either a judge or a jury that direct substantive claim in his habeas, either his direct appeal or his first habeas petition challenging the jury instruction or an effective assistance counsel claim based specifically on the failure to object to the jury instruction? Well, yes, there was the state habeas claim was that basically this instruction was faulty and that it involved the objection that the defense counsel made at trial was improperly overruled. So it brought in parole. Parole was mentioned both in the state habeas petition and in the jury instruction and in the prosecutor's argument. So I don't see how this is not exhausted. Okay. But do you ever, do you ever anywhere in there I'm looking argue that any cause and prejudice to excuse the procedural default in this claim? Well, I'm not sure there is any procedural default, Your Honor. What we have here is that it was, there is, it's basically IAC for failure to raise it on appeal. So we have the, it was not raised on appeal. But the, what we're saying here is that the Nevada Supreme Court addressed that and addressed the underlying claim on the merits and they did it on the merits by arguing that by, by holding that the instruction was proper, but only on, only as to pardons. But exhaustion and procedural default are two different issues. Yes. And so if the first is, because it was claim 13, right, that you're talking about. Yes. And if that's unexhausted, then we, we would look at procedural default and see whether claim 13 would be procedurally barred by Nevada state law and whether it can relate back to the broad appellate IAC claim that you raised in the state post-conviction proceedings. And if, if then when you go through procedural default, then at some point you've got to, you've got to argue cause and prejudice. And I don't see any cause and prejudice argued on the procedural default. So I'm trying to, I'm trying to give you every, every exit where you can go. Well, the, the, the problem here is that, is, is not that the claim was different, I think, as the state says, but that the claim included, we have here two claims. We have both the underlying substantive claim that the... We had 10 and 13, right? Yes. In that area. And, but the correct statute relating to parole, 1099.4, 213.10994, was in effect, and it flatly precluded parole if certain conditions apply. So we have parole being mentioned here, both in the instruction itself, 10 years, not, you know, and which was, which was incorrect. It was 20 years. He was not to be eligible. You had it in the, in the prosecutor's argument and you had it in the state habeas. So I, I don't see that there's a, there's a really an exhaustion problem here. The, at, at the time of Atkin's trial, he would be, he would be flatly precluded from parole if some of these conditions apply, which I alluded to earlier. The, basically, one of them being that he was on parole when this was committed. So the whole parole thing here was a red herring for the jury. The, the, the states, again, here, the states relying on California versus Ramos. In Ramos, the instruction was both accurate and relevant to a legitimate state interest. Whereas here, it was neither. It was inaccurate. It was prejudicially misleading. And it did not relate to any state interest. Okay. If you can show, if we get to a prejudice analysis here, what do you have to show to overcome? Obviously, we're, I think we're all familiar with what the facts are here and in, in many ways. And we know what the evidence was that was put forth by the state on, we know what the aggregating factor, aggravating factors were that were argued and the mitigating factors in terms of his, his bad childhood, limited, you know, he had, he had some mental issues. He, not a terribly high IQ. He had, that it would be difficult for him to control himself in many ways. I'm just wondering on, but his defense at trial was that he was there, but he, but the other people were the ones that did it. Obviously, he had a little bit of a sticky problem because they had three different footprints on the victim's body as far as, and, and I think his, his brother testified against him, right, in the trial. Yes, Your Honor. Did he, you know, and then there were some other people that overheard conversations that said certain things, but they'd made prior inconsistent statements. So the jury heard all of that. Did, did your client ever make a comment? Did he ever talk to the police and was that comment introduced in trial? No, Your Honor. There was nothing about his police comments that was introduced at trial, but... Okay. So in the, in the guilt phase, nothing was about his. So in the guilt phase, the people that were the prosecutor basically put on against him had to do with the, the physical evidence. His brother became state witness. Then there were a couple of people that overheard conversations between, what's it, Doyle, his brother, and your client, and those were subject to some sort of impeachment. And then we had doc, we did not have Dr. Colosimo in the case, in the guilt phase, right? In the guilt phase, Your Honor, yeah. But we did have him in the... Right. Well, I, I think those facts are really indicative of this being a fundamental miscarriage of justice. Doyle and the two Atkins brothers were together. The, the victim comes over to their house. She has consensual sex with both Atkins brothers. She refuses to have sex. Doyle's humiliated and annoyed at this. Pissed off, if you want. And he has the motive to do things. They go out and Doyle, Doyle is driving the truck. They think they're headed towards downtown. They go off into the desert. There's no way that Mr. Atkins, Sterling Atkins could know that this was going to happen. How did they get a kidnapping on him? I don't know. He's in the back... Well, okay. I think, but there is evidence and the jury has to decide what they believe or not. But there is evidence that your client sees the, sees Mason making a, trying to make a phone call and he talks her out of it. And there is evidence from these people that overheard conversations that what they thought was going on, that Mason was going to report Doyle for rape and they wanted to prevent that from happening. And there is evidence that the jury heard that, that there's a decision that she's got to go. And then you've got the physical evidence of three different footprints on her body. Terrible injuries. You've got the testimony of her brother. You've got, and then I guess the Nevada Supreme Court overturned the sexual part of it because she had some foreign object in her rectum that was found there. So you have terrible facts. I mean, she's really beat up badly. She's got all sorts of broken ribs, her head, her, she's got a, like a handle up her rectum and she's left in the desert. I think there's a good argument that I don't think that these three people, the jury would have thought these three people woke up that day to, uh, to murder this woman. But there's a long, there's a lot of testimony that the jury hears about how this day evolves. Some perhaps consensual sex, some perhaps not consensual going in the car. I think, isn't your client in the, the, the bed of the pickup? Yes, Your Honor, with the victim. And there's three sets of footprints on Mason's body, right? Well, yes, the, the, Sean Atkins, the brother, uh, testified that it was a, not a offensive blow. It was to see if she was still alive. But the, the salient facts here are that Mr. Atkins had no motive to do this. He did not know they were going to head out to the desert. He thought they were, they were going downtown. He had no motive. I think Judge Gould's trying to state something here. I have a question. Wasn't there a point in the record where one of the government's witnesses testified that Atkins had made a comment that we murdered this woman? Made a comment, I'm sorry, that... That we murdered this woman. Um, I don't recall that, but maybe even if there was such a comment, it doesn't really go to, uh, they were together. This thing that happened when they were together. That's not in dispute. But I, I just do not see how this, Doyle's driving this truck. How could there be a kidnapping? Um, Mr. Atkins had no reason to sexually assault this victim. Uh, they had just had consensual sex. Doyle was the one... But those are, you're sort of arguing factual things and that we're not in that land here as far as if we, if we're assessing prejudice, we have to think of everything that the jury heard. And they may not, and when you argue the case in a trial court, of course you argue it the way that's best for your client. The prosecutor argues it a different way, and then the jury makes a determination. But I think here, when we're assessing prejudice, we have to, just because the jury didn't see it your way, there's other ways they could have seen it. Yes, I understand. Your Honor, I, I want to reserve five minutes. Five minutes? Okay. Thank you. Good afternoon. Good afternoon, Your Honor. Good afternoon. My name is Heather Proctor, and I have the honor of representing the Respondent's Appellees in this matter. I'd like to address the questions regarding, uh, the claim regarding the jury instructions. This claim was not exhausted. The claim that was presented in the state courts was limited to a claim of prosecutorial misconduct for the cross-examination of the one witness. There was never a substantive claim that was presented to the state courts regarding the jury instructions, and the Nevada Supreme Court did not address the substantive claim of the jury instructions at any point. They did talk about the pardons board, but they did not talk about the clemency instruction itself. This claim remains unexhausted, and, excuse me, it is now technically exhausted, but procedurally barred as determined by the district court. So if you, I, I'm just trying to go every on-ramp, you know, just push this through in terms of if his argument is obviously because it was this very broad claim that somehow it encompassed that. Um, if we just take it to the next level, he said it's not procedurally defaulted. Why do you say it is? I say it is procedurally, but it's technically exhausted but procedurally barred because it was never presented in the state courts either on direct appeal or in the first state habeas petition as a substantive claim regarding the jury instruction. Does he have, does, uh, Atkins have any way then to go into a cause and prejudice argument from there? No. Uh, the only way he might be able to do it is if he could have done an ineffective assistance of direct appeal counsel claim, but he didn't raise that and he didn't exhaust that claim itself under Edwards versus Carpenter, and therefore he could not use that as cause under Murray versus Carrier. And so there, he has, he has the burden to show cause and prejudice to overcome that bar and he simply has not done so. He's arguing cause under, for the change in law, right? For the change in law? For the, um, I think relying on Sechrest? Sechrest. Sechrest. So Sechrest was not a change in the law. What Sechrest did is it recognized Valerio, which I believe is a 1985 case, and in that case, they determined that the procedural bar of Nevada Revised Statute 34.810, which is the bar that requires a claim to be raised for the first time on direct appeal, if it's a substantive claim, that decision said that for direct appeal cases, excuse me, death penalty cases, the 34.810 would not apply and it was not a proper bar. Sechrest simply recognized that Valerio case, which existed a decade before Atkins Direct Appeal. That does not stop though, because there are other procedural bars that would be applied that are not in that same context. First of all, there would be the statute of limitations bar, which is Nevada Revised Statute 34.726. That gave him one year from the direct appeal in order to raise his claim, which he obviously did not do. There's a second bar, which is the latches bar under Nevada Revised Statute 34.800, that the claim has to be raised within five years of the direct appeal or there's a presumption of prejudice. Well, that's why his claim is procedurally barred in state court, right? So he can't exhaust it now, is your position? Correct. Right. And I think he's relying on Sechrest more for the, as a change in law, in the substance of the claim on the jury instructions. Of the underlying claim itself. I believe so. And that's my understanding of his argument on cause for failure to exhaust. I understand that. And if you look at the state cases on this particular jury instruction, there's cases in 1995 called Sonner v. State. I believe that was cited. If not, I will be happy to do a 28-J letter to bring that citation to the court's attention. In 1985, what Sonner did is it recognized the creation of a statute, Nevada Revised Statute 213.085, which stated that a pardons board could not commute a sentence of either death or life without the possibility of parole to a sentence that included parole. However, that statute only applied to individuals who were convicted on or after July 1, 1995. And Atkins was convicted in April of 1995. So that new statute would not apply. In addition, it did address the parole board statute of Nevada Revised Statute 213.1099, which is whether an individual could be paroled once a sentence was commuted. That statute had been in existence well before Atkins' trial. Well, there was some sort of error, I think, because the fact that he had been convicted of the assault with a deadly weapon would have put him in a different category, and that wasn't really talked about here, right? So Secrets does talk about that parole board statute, which is the 213.1099. First of all, it is a permissive statute. This is the parole board may consider, may not consider a person eligible if they had been commuted, if they meet certain criteria. It is not a mandate that the parole board cannot consider this individual. In addition, the question here is not... Has that been interpreted that way, that it just becomes discretionary? I mean, it may not seem a little bit more mandatory than may. It's stronger, but it is still a permissive statute. And there are not any, excuse me, I don't believe there are any Nevada Supreme Court cases that address that particular issue. So you're saying that it's arguable that the parole board could, even if someone committed the crime while they were in parole, would still be eligible for conversion from life without parole to life with parole? So that's the parole board, the pardons board. My argument is that this is the question regarding the clemency is the question regarding the pardons board. And that's where it starts. And actually, the statutes in Nevada, the Nevada Constitution actually prohibited the individual from being, the parole board from commuting a person who is serving a death or life without the possibility of parole sentence to a sentence of parole. And that Nevada Constitutional Amendment had been in place since 1981. However, the clemency jury instruction was not that specific. The clemency jury instruction was very broad, where it said there were circumstances under which the clemency board could alter a sentence, but the jury was not permitted to consider that. And so it was not misleading. It did not say that if he were to be commuted to a sentence of life without the possibility of parole, for instance, that he could not be released on parole. That statute, that jury instruction was not that specific. Rather, the statute was very specific. If he was given life without, that meant life without. If he was given LWOP, that meant LWOP. If he was given death, then you have to assume that is going to be executed. Otherwise, they were told, under certain circumstances, the board may alter a sentence, but you can't consider that. Well, counsel, I have a question for you. I want to ask you the same question I asked the appellant's counsel. Is there anywhere in the record where one of the trial witnesses testified that Atkins had made a statement, Sterling Atkins, that made a statement that we killed a woman? Yes, I believe that was the statement that he made to Jerry Anderson, that he stated things got out of hand and that they killed Mason the night before. Okay, and how did that come into evidence? That came into evidence because Anderson testified during the guilt phase. During the guilt phase? Yes. Okay. So, Anderson testified to that? Yes, Your Honor. To that being said to him? Yes, Your Honor. And it would be an admission? Yes, Your Honor, it would. Of Atkins, so there's no hearsay bar, right? I would agree, Your Honor. Okay, thank you. So, since I understand your position to be firmly that this was not exhausted, but just bear with me on how could, what would an exhausted claim look like here? My understanding of the record is counsel did not object to the instruction. There was no object to the instruction. There was no objection to arguments that, when it was argued in closing argument by the prosecutor, correct? None of that occurred? You are correct. All right. But then, so, but how, what would have taken, what should have been presented in your view to present an exhausted claim here? How would? Rather than presenting it as a substantive claim, he could have alleged that trial counsel was ineffective for failing to object to the jury instruction and failing to object to the prosecutor's, excuse me, arguments in closing argument. That would have been the proper way to exhaust this claim. And that was not done. So, going to the other claims that obviously, if I think the certified claim won and there's different, there's different off ramps on a lot of this, whether you find something exhausted or then you get into the Martinez analysis and whether there's cause and prejudice. Are there any areas where you think it gets into Martinez but prejudice isn't shown? With like, say for example, Colosimo or not presenting more evidence of his terrible childhood. Your Honor, we would certainly be of the position that if he was able to find cause on any of those or ineffective assistance counsel on any of those, he was not able to show prejudice on any of them. Is there anything that was presented previously? Because sometimes when you say that there, when on a habeas you see where that there were errors and it would have had a different result. There are affidavits from another expert that sees the defendant and says, I would have testified to X, Y, and Z or other people opine on how you could have presented other instances of abuse or whatever. And I think it ended up in this way that they said, yeah, you could have put on more evidence, but it would have been cumulative and it wouldn't have made a difference in the end. Did Atkins put on anything saying, this is my offer of proof and this is why it would have made a difference? Regarding the expert testimony? Yeah. Not to my knowledge. And Colosimo, my understanding is, okay, the murder happened in 1994, Colosimo testified in 1996. 95. 95, okay. And then in any, have there been any other experts that have been proffered that would show a difference? Not to my knowledge. I think there were, in all of this, there were allegations that Colosimo should have testified on the guilt phase, not just the penalty phase. Yes, Your Honor. And what's your response to analyzing that claim? Certainly, Your Honor. The issue with that claim is, number one, Dr. Colosimo's testimony in the guilt phase was that Castillo, excuse me, Atkins was entirely confident that he knew right from wrong, that because of the disorders he suffered from, he tended to do the wrong thing instead of the right thing, but he understood that it was right and wrong and that he could be punished for it. So it was evidence that he was confident and that he would not survive a challenge based on insanity. He just didn't meet the criteria. The other problem with that is if he had been presented during the guilt phase and there was time to present him, he would have had to testify regarding all of these disorders and psychoses that he diagnosed Atkins with, both in his testimony and in his report. It would have also gone into his 1999-92 conviction for the assault with a deadly weapon, which was part of the basis for his determinations. It would have gone into all of this other evidence that would not be necessary, would be ineffective to present in a guilt phase. So was the assault with a deadly weapon presented in the guilt phase or did it just come in in the penalty phase? I believe it was only in the penalty phase. But if Polisimo would have testified in the guilt phase, it would have necessarily come out because it would have been part of the information that he based his conclusion on. Correct. So is there somewhere in the record that this was a strategic decision by counsel not to or? Your Honor, we can only presume that it was a strategic decision. First, the basis for the whole notion to have Dr. Polisimo appear in the guilt phase or that there was a question regarding competency was not that, never a question as to whether he was competent to stand trial. The only question regarding competency was if he was competent to consider the plea negotiations. Because in counsel's opinion, he rejected a non-death option immediately without reservation. He didn't want to talk to his attorneys about it because he was under a misunderstanding of the law that his co-defendant, Doyle, had been convicted and sentenced to death two months earlier. And Atkins believed because one person had already been sentenced to death, they could not sentence a second person to death for the same murder. That's a misunderstanding of the law. That's not a demonstration that he didn't understand the plea negotiations. And that was the basis for the competency hearing request in the first place. But they withdrew it, didn't they? Yes, Your Honor, and that's what I was going to mention was they entered a written argument motion for the competency hearing and it was argued the next day. And the day after that, it was withdrawn by counsel for the defense and they agreed that they would only present him in the penalty phase. So that certainly suggests that counsel had a strategic reason for doing so and they determined that it was not appropriate to show him in the guilt phase. What is defendant's best argument that had more mitigating evidence been presented, it would have made a difference in the outcome of the case? Your Honor, I don't believe defense has a good argument regarding that. We don't agree with the argument, but what would be the best argument? There could have been more people. Or what did the other people say that Sterling Sr. didn't say? Or that the stepsister didn't say? Your Honor, they would have to produce evidence that was different than the type of evidence that was presented at the mitigation phase. And it's our position that they haven't been able to do that. And so they would have to present evidence that they haven't yet produced yet of something entirely different. So what offer of proof have they made about what should have been presented? Sure, they offered quite a bit of declarations, which it's even questionable whether the court can consider those declarations under Ramirez. But beyond that, the additional information that they seek to introduce was that the father was even worse than he testified to himself. That he did all these horrible, awful things to his children, to his wife, and very cumulative of what was already presented. Particularly, he himself testified that he did all these horrible, awful things. Stephanie, the stepsister, corroborated a lot of that information, saying that he was a horrible, awful father and beat everybody. They had alcoholism, they had drugs in the home, there was domestic violence. And then Dr. Colisimo also corroborated all of that evidence from his interview with Atkins, who also said how horrible and awful this was. They produced some additional facts, but none of that would have tipped the scales to a sentence other than death, particularly when you consider the six very strong aggravators in this case. He simply would not have done that. In determining the ineffective assistance of trial counsel, what weight should be given to Ms. Malia's declaration that she was deficient in failing to pursue Mr. Atkins' cognitive defects? Your Honor, first of all, that is hindsight, and that is prohibited under Strickland. Of course, coming 20 years after the fact, it would be easy to say, well, I should have done this or that. In addition, it was actually co-counsel Kozol who was the one that was responsible for preparing the expert. He had been on the case for several months, and he came in and replaced Ms. Malia. He was the one responsible for communicating with the doctor. He was the one that examined the doctor, and he did a very good job of bringing out all of the information from the doctor's report. And so Ms. Malia may have had some regrets later on in life, but it doesn't demonstrate that the counsel wasn't effective in any way. And also, that declaration itself is subject to question whether this Court can consider it under Ramirez, because it came in in 2016. The crimes in this matter occurred in 1994 and were tried in 1995. So in your view, because this is under AEDPA and the deferential standard that it's got to be against clearly established law or an unreasonable application of the facts, where does the AEDPA standard come into play here, where you think it makes a difference? The AEDPA standard would not apply to a majority of these claims, because they are procedurally barred. It does come into play with the guilt phase question as to presenting Dr. Colisimo in the guilt phase. The Nevada Supreme Court did address that on the merits. The Nevada Supreme Court did not have an opportunity to address the rest of these claims on the  They addressed some aspects of them, and certainly to the extent the Nevada Supreme Court did address it on the merits, that would be entitled to epidefference. But the majority of these claims, they simply did not have an opportunity to do so. Counsel, I have a question if I may. Could you summarize from the State's point of view, what were the aggravating factors the jury could consider to outweigh any mitigating factors? Certainly Your Honor. There were six aggravating factors in this case. Two were based on Atkins' prior conviction in 1992 for aggravated assault, excuse me, assault with the use of a deadly weapon. And the facts of that were pretty heinous. He pounded on a gentleman's door demanding to see Robert. The resident had no idea what he was talking about. Atkins would not stop banging on the door. He opened the door and his cat ran out. Atkins said, I'm going to go kill the cat. And he took off. The resident then was concerned. He left his apartment looking for security. Atkins jumped out from some bushes and stabbed him in the back with a three and a half inch knife. That occurred two years before the murder in this case. And he was convicted and sentenced to three years. He was released exactly two months to the day before the murder in this matter. That conviction served for two aggravators. One was a prior conviction for violent offense. And two was the fact that he was still on parole for that matter at the time he murdered Ebony Mason. The third aggravator was in order to avoid a lawful arrest. And once again, that was because she threatened to report not only Doyle, but all three men for rape. Yeah, because there was some sexual contact earlier in the night with Sean and Atkins, but not with Doyle. And that was what was frustrating Doyle. The fourth was torture and mutilation. And that was due to the extensive injuries to the body. The nine broken ribs, the extensive injuries to the head from being struck by a rock or brick, the footwear impressions that were left on the body. And that was the fourth aggravator. The fifth was the first degree. The murder was conducted in the course of the first degree kidnapping. And the sixth was that it occurred during a sexual assault. And so all of those aggravators were extremely strong. They presented quite a bit of evidence regarding all of them, both in the guilt phase and the penalty phase. And none of the proposed mitigation evidence tips the scales on reweighing to where they would not have been held. Well, the sixth one got overturned by the Nevada Supreme Court against both Doyle and Atkins, right? To clarify, the sexual assault conviction was overturned. Because they didn't know whether she was alive or dead? Correct, Your Honor. When they inserted the stick. But the claim on first state habeas was counsel was also ineffective for failing to challenge the aggravator. And the Nevada Supreme Court actually upheld the aggravator in the first state habeas proceedings, saying it didn't matter whether she was alive or dead at the time for the aggravator. What mattered for the aggravator was that there was a sexual component to the murder. And so that sixth aggravator actually remains. So then the mitigators, they weren't necessarily by number. But it was his childhood and Dr. Colosimo's analysis of his mental capacity. And I think there was discussions of schizoaffective, paranoid, various... As well as he did well in a more structured setting. Now the instruction on that isn't... Aren't the jurors specifically told you don't just count them up? You can count them up. But I mean, one mitigator could outweigh six aggravators, right? Absolutely. The jury just didn't find that here. Correct. The jury was instructed under Nevada law that they had to find one aggravator, at least one aggravator, unanimously. And then they could consider and find their own mitigators. And then they were tasked with determining whether those aggravators were outweighed by the mitigators. And even if they find that under Nevada law, they do not have to impose a death sentence. It simply makes it available as one of the sentences that they can impose. Were there specific findings as true of those six aggravators by the jury? There is a verdict that says the jury found all six aggravators. Counsel, I have a fact question, which may or may not be important in the total speed matter. But you urged there were several footprints on the body of the victim. And my question is, was one of those sets of footprints linked to Sterling Atkins by evidence that was admitted? Not directly, Your Honor. The only individual that was ever specifically connected to one of the footprints was Doyle. And that was when they recovered Adidas shoes that several witnesses stated Doyle was the only one who wore those shoes. So then, are the footprints relevant to the state's conviction of Atkins here? Your Honor, I think it enhances the state's conviction. The testimony was very clear. There were only four people out there the day of the murder. Atkins, his brother Sean, Doyle, and Ebony Mason. And they quickly determined that Ebony Mason's shoes, which were located at the death scene, were not one of the shoe prints that they found either around the body or on the body. So the other shoe prints could only belong to those three individuals. Was there testimony that there were three distinct footprints, though? Yes, Your Honor. But the closest link was as to Doyle, because they had his Adidas shoes? Correct. So my understanding of the relevance would be that because his defense was he was there, but he didn't participate in it, that even though you can't show that it's his shoe and his foot, but there are three footprints on her.  That is absolutely correct. And while... So you take it from there, whatever that means. Absolutely, Your Honor. It certainly does enhance and enforce that Atkins was one of those three. What... You know, I guess from the standpoint that for after he's convicted, that if he doesn't prevail on any of the instances that have to do with the guilt phase, is it's just what more could have been said about him that could have convinced the jury that he shouldn't get the death penalty, right? Yes. Kind of break down to me exactly what was said. I know that once it sort of stuck out to me as the father said he put his children's hands on the stove. He admitted that and that the kids were taken away from him and he talked about, but tell me specifically how grave a picture of abuse was portrayed by the witnesses or how not so. Your Honor, I would note that the district court in addressing this matter mentioned that this was a nightmarish. The three witnesses painted a nightmarish abuse, neglect, and dysfunction in the family. And that was the type of evidence that was presented. There's evidence by Mr. Sterling Sr. that he repeatedly beat his children, particularly Atkins first. He did not care for his children at all. There was domestic violence where they would see him repeatedly beating their mother. Both parents were extreme alcoholics. Both parents were using drugs. Stephanie reinforced all of that as well as portraying the mother who was unable to function because she was such an extreme drug dependent that Stephanie had to basically take over for these individuals. These children were in and out of foster care even though Atkins kept asking to be returned to the home. And then you have Dr. Guisimo who... Did they have any food or housing insecurity? There were no specific instances where they talked about extreme poverty, but the children did talk about where they would have to sometimes fend for themselves because their parents would not feed them. I don't know the answer to this. And I don't know if it... In California, for example, the trial judge says the 13th juror. And even though a jury recommends death, the trial judge still has the option of saying overruling that. What is it... What's the law in Nevada? The law in Nevada is if the jury imposes a death sentence, then that is the sentence that is imposed. So the court... Can the court review it for sufficiency of the evidence or... No, but the Nevada Supreme Court does review all death sentences for various underlying... But the judge has to impose it. Yes, Your Honor. Okay. Thank you. Unless there are any further questions, I would submit. Thank you. Thanks, Counsel. Appellant, we'll hear a rebuttal, then like Stacy, make the clock five minutes here. Okay. So give me your full five minutes of planned rebuttal. Thank you, Your Honor. Just to recap what Counsel said, Yeltsin v. Nonemaker has held that reaching the merits exhausts the claim, and our position is that the Nevada Supreme Court on the jury instruction claim did reach the merits. And there was no default here. The district court held that the substantive claim was defaulted. We would disagree with that. We've briefed that, that that was wrong, but the IAC of appellate counsel claim was denied on the merits. So we have here basically a situation where, as I said before, that this was prejudicially misleading, under clearly established federal law of Caldwell and Simmons. Can you tell me where in the Nevada Supreme Court opinion you think they reached the merits on your jury instruction challenge? Yes, they did. On the Petrocelli instruction, that's your argument? Yes. They did reach the merits on, as to the board of pardons. They didn't examine it on parole, but they did reach, they said that basically it was a correct instruction on pardons. But even if this instruction was correct, it's still prejudicially misleading. That's our point here, that basically you have a situation where the jury was told time and time again that Mr. Adkins could be released on parole. And that testimony was definitely in their minds. He's stressing, the prosecutor stressed he did poorly on parole. He argued incorrectly that life with parole meant he would be eligible for parole in about 10 years, that Ebony Mason's life was worth a heck of a lot more than 10 years. And he asked the jury, will a sentence of death prevent this defendant from once again being paroled and committing another murder? You bet it will. That's at 2 ER 453. And argued that life without parole can become life with parole. This is all incorrect. The pardons board was also mentioned in the argument, but basically the sentiment in the jury's mind was that this guy could get out maybe in 10 years. And this is the only reason the prosecutor said to prevent this, the only way to prevent this was to give him a death sentence. So basically we have the state habeas brief, which did cite Caldwell versus Mississippi and cited Malia's objection at trial. Malia did not object to the instruction itself as Judge Callahan has mentioned, but she did object during the prosecutor's argument. And she stated that parole, pardon is not parole, but he's talking about parole. So the state habeas claim also mentioned the prosecutor's argument that a life sentence with parole, you have the hope for a release on parole. And if an individual is sentenced to life imprisonment without the possibility of parole, can that pardons board commute that sentence from life without to life with? So these references in state habeas were sufficient to put the parole question squarely before the state's courts. Now there's also been some argument by counsel here that Calissimo's testimony would have been, if he was presented at the guilt phase, that it would have been damaging. But the damaging elements of that testimony would have been irrelevant to guilt. And it could have been objected to and it could have been, the objections would have been sustained. Well, but it's, but I think those of us that have done trial work know pretty much once you open the door, the barn door flies open and he's going to be subject to cross-examination and everything that he considered to form his opinion is going to come in. And you can say, you can give limited instructions, but I think certainly there's an argument that you wouldn't want people to know about. And if he said, oh yeah, I considered the assault with a deadly weapon, but then a good cross-examiner is going to go into all the details, which Ms. Proctor just mentioned and who would want the, you know, it's, I think you know, and I think most attorneys know that sometimes having a bad life and having things wrong with you is a double-edged sword. Sometimes it works, but sometimes jurors think, well, this person is so bad that there's, you know, that they're therefore bad on the guilt part of it. And then if you, when you introduce it at the penalty phase, they think they're so bad that they can't be saved. Well, yes, but our- So it's double-edged. Yes, Your Honor. But our point is that those damaging things were, would have been totally irrelevant as to guilt. And the helpful thing- To you. But if the jury heard them, a lawyer, you have to think about how's it going to affect the jury. Well, we're saying the jury wouldn't have heard them because they would have been excluded as irrelevant, objection irrelevant. So- Well, but how does he give his opinions without saying what the basis of his opinions are and all of those things would come in? I'm not understanding your evidentiary ruling here. They came in because of the ineffective assistance of Mr. Kozol, who prepared this witness. He allowed all this stuff to come in. He didn't prepare Colissimo. This damaging stuff came in at penalty phase. But we're saying that if he's testifying, for instance, as to various things that were damaging here, that it's not relevant to guilt. They would have been relevant to punishment, but not to guilt. I mean, you know, it has, it just wouldn't have, it would have been, the objections would have been- So are you speculating what a court would have done had he testified? Yes, I am, Your Honor. All right. Okay. So if you are Ms. Malia at that point, not knowing what the judge is going to do, and I'm here telling you the other side of what the judge might be looking at, couldn't a lawyer make a strategic decision that it might be a little bit risky? Your Honor, I don't think strategic decisions, which was the basis of the state court's ruling here, come into play at all, because this is, there was no strategy- Well, the state court said what? That it was strategic? Strategic, Your Honor, yes. So is that subject to AEDPA review? Possibly, but it's, it was wrong because there could be no strategy here because he wasn't even ready by the time of the guilt phase. He wasn't prepared. He didn't have his report in. That's why they didn't present him at guilt. So there could be no strategy in not being prepared. Counsel, I'm sorry to interject, but you're more than two minutes over your already extended time. I'm not going to cut you off in mid-sentence like I've seen Supreme Court justices do, but rather, why don't you finish your argument within the next- I won't interrupt you anymore. I promise. Thank you, Your Honor. The time is yours. And I was just going to add here that the four aggravators, kidnapping, torture, sexual assault, and trying to prevent an arrest here, those would have been basically nullified by Sean Adkins' testimony had he been allowed to testify. The other prior, remaining priors, prior offense, or on parole, those are duplicative. And so we really, I think, would have only one aggravator to deal with here. So unless there's any further questions- What's the aggravator that you say we have to deal with? Well, I would say that there's two aggravators, prior offense and was on parole at the time. But I'm also saying that those are duplicative. And I think they have been in later Nevada law. We could have, had the defense been properly prepared, they could have presented testimony to negate the kidnapping, to torture, the sexual assault, and this was done to prevent arrest under Sean Adkins' testimony. He said the only person with a motive to do these things, the only person who had the ability to do it, the kidnapping especially, was Mr. Doyle. So we have, we could have eliminated four of the aggravators here with- That jury would have had to believe him.  Okay. Thank you, Your Honor. We respectfully ask that this Court grant relief to Mr. Adkins. Thank you, counsel. Thank you. I want to thank both counsel for their spirited and very helpful advocacy. This case shall now be submitted and the parties will hear from the court in due course. Thank you. So, so- All rise. This Court for this session stands adjourned. Thank you.
judges: GOULD, CALLAHAN, SUNG